# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY E. MCCALLISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11-CV-792 CAS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Anthony E. McCallister for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq.  For the following reasons, the Court will remand this matter to the Commission for reconsideration.

## I.    Legal Standard of Review

Title 42, United States Code, Section 405(g) states that the Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review.  42 U.S.C. § 405(g).  42 U.S.C. § 405(g) authorizes the Court to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Id.

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole."  Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005) (cited case omitted).  Evidence is "substantial evidence" if a reasonable person would find it adequate to

support the ALJ's determination.  Id. (cited case omitted).  In addition, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989)).

In determining whether the ALJ's decision meets the substantial evidence standard, the Court considers "all of the evidence that was before the ALJ, but [does] not re-weigh the evidence." Vester, 416 F.3d at 889 (cited case omitted).  The Court must consider not only the evidence that supports the ALJ's decision, but also the evidence that detracts from the decision.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole."  Id. (cited case omitted).

## II.   Procedural Background

Plaintiff Anthony E. McCallister, who was born in 1968, filed an application for Title II benefits on August 28, 2008.  (Tr. 117.)  He alleged a disability onset date of March 10, 2008, due to impairments relating to his back, neck, shoulder, hip, and foot; and chronic gout.[1]  (Tr. 154.)  His application was denied initially on December 1, 2008, after which he requested a hearing before an ALJ.[2]  (Tr. 73-77, 80-81.)

---

[1]Gout is an inherited disorder characterized by a raised but variable blood uric acid level and severe arthritis resulting from the deposition of sodium urate crystals in connective tissues and articular cartilage. Stedman's Medical Dictionary at 827 (28th ed. 2006).

[2]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  20 C.F.R. §§ 404.906, 404.966 (2007).  These modifications include, among other things, the elimination of the reconsideration step.  See id.

On February 10, 2010, following a hearing, the ALJ found plaintiff was not disabled.  (Tr. 11-20.)   On March 25, 2011, after considering additional evidence from plaintiff, the Appeals Council denied plaintiff's request for review.  (Tr. 1-7.)  Thus, the decision of the ALJ became the final decision of the Commissioner.

A.    Medical History

On March 9, 2007, plaintiff saw George P. Stachecki, M.D., for influenza and gout.  Dr. Stachecki prescribed Atenolol**,** Allopurinal and Vicoprofen for plaintiff's pain.[3]  Dr. Stachecki also recommended a urinalysis for the next visit.  (Tr. 185-86.)

On September 20, 2007, plaintiff saw Dr. Stachecki again for back and neck pain.  Dr. Stachecki noted plaintiff's chronic problems of gout, hypertension, osteoarthrosis, and obesity.[4]  At this visit, Dr. Stachecki prescribed plaintiff Flexeril, Clinoril, and Vicoprofen.[5]  Plaintiff followed up this appointment with a urinalysis at Quest Diagnostics on October 18, 2007.  (Tr. 177-84.)

From May 8, 2008 to August 20, 2009, plaintiff visited Maryam Naemi, D.O., several times for back and foot pain.  Dr. Naemi ordered an MRI of the lumbar spine, which was normal.  Dr. Naemi recorded plaintiff's weight as ranging between 283 and 304 pounds.  Dr. Naemi diagnosed plaintiff with gout, hypertension, and back pain.  She referred plaintiff for pain management and

---

[3]Atenolol is used to treat high blood pressure (hypertension). Allopurinal is used to treat gout. Vicoprofen is used to treat moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

[4]Hypertension is high blood pressure.  Osteoarthrosis (syn. osteoarthritis) is arthritis characterized by erosion of articular cartilage that results in pain and loss of function.  Stedman's at 927; 162 and 1388.

[5]Flexeril is used to treat muscle spasms.  Clinoril is used to treat pain, swelling, and joint stiffness from arthritis, including gouty arthritis. WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

prescribed Indocin, Colchicine, Oxycodone-Acetaminophen, and Vicodin at various times.[6] For plaintiff's hypertension Dr. Naemi counseled him on diet and exercise and prescribed Amlodipine.[7] (Tr. 286-303.)

From May 15, 2008 to May 5, 2009, plaintiff was treated by Thomas E. Albus, M.D., Richard B. Helfrey, D.O., Jeffrey W. Wallace, PA-C, Timothy G. Graven, D.O., and Laura C. Horn, PA-C, at St Peters Bone & Joint Surgery. On May 15, 2008, plaintiff saw Dr. Albus for pain in his left foot. Plaintiff reported to Dr. Albus constant pain in his left foot that persisted since a month prior to the visit. Dr. Albus ordered a CT scan for the ankle, which showed a "minimally displaced fracture of anterior process of calcaneum."[8] (Tr. 224, 243.)

On May 19, 2008, plaintiff visited Dr. Helfrey for continuing complaints about foot and ankle pain. Dr. Helfrey reviewed the May 15 CT scan and determined the fracture to be an old one. Dr. Helfrey noted that plaintiff was not in acute distress, "with a nice range of motion in the knee," but also marked swelling over the sinus tarsi.[9] Dr. Helfrey attempted to aspirate the subtalar joint, but found no fluid.[10] Dr. Helfrey administered an epidural steroid injection, prescribed Norco, and

---

[6]Indocin is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendinitis. Colchicine is used to prevent or treat gout attacks. Oxycodone-Acetaminophen and Vicodin are used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

[7]Amlodipine is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

[8]The calcaneum is the heel bone. Stedman's at 286.

[9]The sinus tarsi is a canal formed by the foot bones. Stedman's at 242.

[10]The subtalar joint sits below the ankle joint and allows side-to side motion of the foot. WebMD, http://www.webmd.com/fitness-exercise/picture-of-the-ankle (last visited June 12, 2012).

recommended a lace-up ankle brace.[11]  Dr. Helfrey also ordered an MRI, which revealed what Dr. Helfrey called "somewhat atypical sinus tarsi syndrome." [12] (Tr. 187-88, 224.)

On June 4, 2008, plaintiff returned to Dr. Helfrey for a follow-up examination on his left foot.  Plaintiff reported to Dr. Helfrey "a little improvement" in his pain from the injection.  Dr. Helfrey did not yet have access to the MRI results.  He directed plaintiff to continue to use the brace and return in four weeks.  (Tr. 195.)

On July 16, 2008, plaintiff saw Mr. Wallace for a follow-up visit regarding his foot pain. Plaintiff reported a new pain in his right foot. Mr. Wallace referred plaintiff to a pain management physician.  Mr. Wallace noted that plaintiff's continuing pain was to be expected in light of his noncompliance with the prior recommendation of using a lace-up ankle brace to stabilize his foot. (Tr. 199.)

On August 27, 2008, plaintiff returned to Mr. Wallace for a follow-up visit.  Plaintiff reported that original pain in his left foot was gone but continued to complain of "lumbar related pain with radiating symptoms down [his] right leg into [his] ankle," possibly resulting from a December 2007 injury.  Mr. Wallace ordered an x-ray, an EMG of the right leg, and an MRI of the lower back.[13]  Mr. Wallace also prescribed Vicoprofen and Medrol.[14]  Frederic M. Sinowitz, of SSM

---

[11]An epidural steroid injection is used to treat pain and inflammation from pressure on the spinal cord.  Norco is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

[12]An opening on the outside of the foot between the ankle and the heel bone.  Am. Academy of Podiatric Sports Medicine, http://www.aapsm.org/sinus_tarsi_syndrome.html (last viewed June 22, 2012).

[13]An EMG is an electromyogram, a graphic representation of the electric currents in a muscle. Stedman's at 622.

[14]Medrol is used to treat various conditions, including allergic disorders, arthritis, and blood diseases. WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

St. Joseph Hospital West, performed the EMG on August 29, 2008, with normal results.  (Tr. 196-98.)

On September 2, 2008, plaintiff underwent an MRI of the lumbar spine  under the order of Dr. Helfrey.  The MRI was normal with the exception of a mild annular bulge at L5-S1 and L4-L5.  (Tr. 200.)

On September 15, 2008, plaintiff underwent a Fluoro Myelogram of the lumbar spine, which revealed a small impression of the thecal sac at L4-L5, which was "likely due to the asymmetric disc bulge."[15]  Plaintiff also underwent a CT scan of the lumbar spine, which was unremarkable with the exception of a mild disc bulge at L4-L5 slightly asymmetric towards the left.  (Tr. 279, 281.)

On September 4, 2008, plaintiff saw Dr. Graven for a follow-up exam on the lumbosacral spine.  Dr. Graven noted that the lumbosacral spine "exhibited tenderness on palpation," and made an assessment of lower back pain and lumbar radiculopathy.[16]  (Tr. 277.)

On September 9, 2008, plaintiff completed a function report for his application for disability.  Regarding his daily life, plaintiff reported that he cared for his own daily hygiene, and prepared simple meals for his daughter.  He reported that he was unable to do activities he previously enjoyed, other than going to movies, because of pain from prolonged sitting or standing.  He also reported that he used a cane or crutches when he was unable to get around, as recommended by a doctor.  (Tr. 142-52.)

---

[15]A myelogram is a x-ray visualization of the spinal cord.  A thecal sac is a sheath.  Stedman's at 1269, 1970.

[16]Radiculopathy is the disease of the spinal nerve roots.  Stedman's at 1441, 1621.

On November 17, 2008, plaintiff received a psychiatric review from Robert Cottone, Ph.D., pertaining to his claim of bipolar disorder in his application for disability.  Dr. Cottone found that plaintiff suffered from no medically determinable mental impairment.  (Tr. 247-57.)

On November 21, 2008, Despine Coulis, M.D., assessed plaintiff for his physical residual functional capacity ("RFC").  Dr. Coulis diagnosed mild degenerative disc disease of the lumbar spine with a secondary diagnosis of gout of the left great toe and possible peroneal tendinitis in the left foot.[17]  Dr. Coulis opined that plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and was unrestricted in pushing or pulling.  Dr. Coulis found no postural, manipulative, visual, communicative, or environmental limitations.  Dr. Coulis noted that no concrete physical abnormalities existed to explain plaintiff's pain, and opined that the severity of his pain was not supported by any imaging or other studies.  According to Dr. Coulis, no diagnosis existed for the cause of plaintiff's back pain, and no evidence existed indicating that his gouty toe was impaired.  Dr. Coulis further noted that the allegations of severe nerve damage and the recommendation to use a walker and cane were not supported by medical evidence.  Dr. Coulis opined that plaintiff was capable of performing "medium work."  (Tr. 258-63.)

From December 1, 2008 to February 2, 2009, plaintiff visited Mahendra Gunapooti, M.D., for pain management for his neck and lower back.  Plaintiff reported to Dr. Gunapooti pain in his neck and back radiating to his extremities as well as associated tingling, numbness, muscle cramps, and spasms. Dr. Gunapooti diagnosed plaintiff with chronic cervical radiculopathy, chronic lumbar

---

[17]Degenerative disc disease is the degeneration of spinal discs that can result in pack or neck pain. WebMD, http://www.webmd.com/back-pain (last visited June 12, 2012). Peroneal tendinitis is the inflammation of the fibular tendons.  Stedman's at 1466, 1944.

radiculitis, and possible post-laminectomy syndrome.[18] Dr. Gunapooti recommended and performed

a series of epidural steroid injections.  Plaintiff reported some relief of pain from the injections.  Dr.

Gunapooti also counseled plaintiff to quit smoking and continue a home exercise program.  Dr.

Gunapooti ordered routine imaging of the cervical and thoracic spine, performed on December 29,

that revealed mild degenerative changes at the C4-5 level.  (Tr. 269-73.)

On May 5, 2009, plaintiff saw Ms. Horn for a follow-up appointment for his lower back pain.

Plaintiff claimed continuing pain starting in his neck and going down to his low back.  Ms. Horn

explained to plaintiff that test results showed no source of the pain and referred him to a pain

management physician and a neurologist.  Plaintiff stated to Ms. Horn that he was "getting by" on

pain medication.  Ms. Horn gave him a prescription for Vicoprofen.  (Tr. 275-76.)

On August 15, 2009, plaintiff saw Suresh Krishnan, M.D., for pain management.  Plaintiff

reported chronic back and neck pain from a motor vehicle accident in 2003.  According to plaintiff,

the neck pain had recently worsened to what he described as a "burning achy" pain that radiated

down the right hand.  He reported that physical activity exacerbated the pain, but rest and pain

medication alleviated the pain.  He also reported that he was able to sleep four to five hours without

disturbance from the pain.  In an examination of plaintiff, Dr. Krishnan noted that plaintiff had very

limited lateral flexion on both sides of his neck.  Dr. Krishnan diagnosed plaintiff with chronic neck

pain secondary to the degeneration of discs at multiple levels and herniation of the disc possibly

causing cervical radiculopathy.[19]  Dr. Krishnan also thought that plaintiff might suffer from cervical

---

[18]Radiculitis is a synonym for radiculopathy.  Stedman's at 1622.

[19]Disc herniation is a protrusion on the disc.  Stedman's at 881.

spinal stenosis secondary to the degenerative changes within the spinal canal.[20]  Dr. Krishnan advised plaintiff to quit smoking and start neck physical therapy exercises to help "in the long run." Dr. Krishnan gave plaintiff a prescription for pain medications and told him to return in two weeks for a possible facet nerve steroid injection.  (Tr. 305-07.)

On September 5, 2009, plaintiff returned to Dr. Krishnan for a follow-up visit.  Plaintiff reported to Dr. Krishnan that his pain had lessened, that he had decreased numbness in his right hand, and that he felt better overall since the last visit.  Dr. Krishnan examined plaintiff and noted increased lateral flexion on both sides of his neck since the last visit.  Dr. Krishnan switched plaintiff from Vicoprofen to Vicodin and provided an additional prescription for Zanaflex.[21]  Dr. Krishnan found that plaintiff had improved with "conservative treatment."  Dr. Krishnan again suggested that plaintiff might pursue cervical facet joint/nerve steroid injections if the effect of the medications seemed to decrease after some time.  (Tr. 308-10.)

On September 29, 2009, Shawn L. Berkin, D.O., wrote an independent medical evaluation on plaintiff.  Dr. Berkin examined plaintiff on August 24, 2009, and then reviewed plaintiff's medical record and test results.  At the time of examination, plaintiff reported lower back pain of a five on a scale of one to ten.  Plaintiff complained that he was unable to climb ladders or stairs, lift, or walk up inclines or for long distances.  In his physical examination, Dr. Berkin found no deformities in the neck's cervical curve, the shoulders, or upper extremities. Dr. Berkin opined that plaintiff suffered from a "permanent partial disability of [forty] percent of the body as a whole at the level of the cervical spine."  Dr. Berkin further opined that this disability was a hindrance to

---

[20]Spinal stenosis is a narrowing of the spinal canal.  Stedman's at 1832.

[21]Zanaflex is used to treat muscle tightness and spasms.  WebMD, http://www.webmd.com/drugs (last visited June 12, 2012).

employment at the time of the December 2007 lower back injury.  Dr. Berkin noted that the combination of plaintiff's disabilities represented a "significantly greater disability than their simple sum." (Tr. 312-22.)

Dr. Berkin recommended anti-inflammatory medication, muscle relaxants, and if necessary, a referral to a pain management physician.  Dr. Berkin also recommended a home exercise program and that plaintiff remain as active as possible, while using common sense to avoid further stress to the lower back.  Dr. Berkin noted that plaintiff should avoid excessive bending, turning, twisting, lifting, pushing, pulling, and climbing; limit lifting to thirty pounds occasionally, and twenty pounds frequently; and limit pushing and pulling to forty to fifty pounds for distances not more than fifty or sixty feet.  Dr. Berkin suggested that if plaintiff needed to exert himself for an extended period of time, he should pace himself and take frequent breaks to avoid exacerbation of his symptoms. (Tr. 321-22.)

B.      Evidence Submitted to the Appeals Council

On May 25, 2010, Dr. Krishnan completed a Disability Evaluation for plaintiff.  Dr. Krishnan noted that plaintiff had severe neck and lower back pain that also radiated to the right hip and right arm, and opined that plaintiff had a permanent disability preventing him from engaging in employment.  (Tr. 335-36.)

On June 29, 2010, Stanley London, M.D., examined plaintiff to evaluate his complaints of neck and back pain.  Plaintiff reported having stiffness in his neck and some limitation of motion in his neck.  Plaintiff also reported to Dr. London that his pain was getting worse and that he was taking morphine three times a day for the past three months which brought him relief.  Plaintiff further reported that he had limited daily activity and that could only stand for five minutes at a time

- 10 -

and sit for twenty minutes at a time. Dr. London examined plaintiff's physical movement, his orthopaedic condition, and his neurological condition. Dr. London diagnosed plaintiff with low back pain and opined that plaintiff also suffered from probable degenerative disc disease and degenerative joint disease. Dr. London opined that plaintiff, in an eight-hour workday, could sit for thirty minutes, stand for fifteen minutes, and walk for fifteen minutes. Dr. London also opined that plaintiff could lift up to five pounds occasionally, but never more than that; that plaintiff was limited in balancing and should use a cane; that plaintiff's disc disease counted as "medically determinable impairment that could be expected to produce pain;" and that plaintiff's pain precluded performance of a full-time work schedule and would demand more than three breaks during a normal eight-hour workday. Dr. London also opined that plaintiff's impairments would cause plaintiff to miss work at least three times a month and cause plaintiff to be late to work or leave work early at least three times a month. (Tr. 324-31.)

    C.    <u>Testimony at the Hearing</u>

On December 2, 2009, a hearing was held before an ALJ. (Tr. 30-70.) Plaintiff testified to the following. He was born on August 23, 1968. He obtained no more than a year of college. He is divorced and has one child, aged six years, who resides with him three days a week. He is six feet, one inch tall and weighs 305 pounds. He is unemployed and has received unemployment for a year. He has applied for Medicaid and worker's compensation benefits but has not received either. He has a driver's license and drives Monday through Friday to St. Charles Community College to attend class. (Tr. 36-43.)

Plaintiff last worked in March, 2008, as a safety director for Durham  School Services, a position he held for two years. While on the job, he fell and hurt his arm and back. Following the

injury, he went to part-time work while getting treatment.  Before working for Durham, he worked for AC Trucking, also called the National Career of Management Services, delivering pharmaceuticals.  This position required him to load and unload the truck, which included lifting over 100 pounds.  He injured his neck while employed at this position.  Prior to this position, he worked as a safety director for First Student Services, as a bus driver, and as a driver for Paul Arpin Van Lines.  He also worked part-time for Sears as a computer tech sales person.  (Tr. 43-47.)

Plaintiff does not use alcohol heavily and does not use street drugs at all.  He has continuous pain in his neck and mid and lower back.  Pain medication, heating pads, and a gel help to manage the pain.  He also tried a TENS unit but this did not help his pain and instead made his nerves twitch more.[22]  He received two steroid epidural injections, which helped for about a month before wearing off.  After his 2005 neck fusion surgery, he was told that his neck would continue to deteriorate and that another surgery might be necessary.  (Tr. 37, 48-51.)

Plaintiff also suffers from gout, mostly affecting the big toe of his right foot.  He has gout attacks about twice a month for two to three days, for which he takes Colchicine.  He uses a cane, which was prescribed by a doctor in 1999, about three times a year for his gout and back. (Tr. 51-54.)

Plaintiff also suffers from pain that would make a job involving sitting for an eight-hour work day painful.  He can sit for about forty-five minutes to an hour and stand for about fifteen minutes before needing a break.  He lays down most of the day, probably six hours in an eight-hour day.  On days that he attends school, it takes him about an hour to get up for school and when he is

---

[22]A TENS unit provides transcutaneous electrical nerve stimulation for short-term pain relief. WebMD, http://www.webmd.com/pain-management/tens-for-pain-directory (last visited June 18, 2012).

done with class, he comes home and lays down.  It is painful to turn his neck either way.  (Tr. 47-48, 54-56.)

A vocational expert (VE) testified to the following.  The computer sales job at Sears is classified as "sales clerk retail."  The job is light in strength and is a semiskilled position.  The VE also assessed plaintiff's past positions as requiring from medium to heavy strength.  The ALJ then asked the VE to consider a hypothetical individual of plaintiff's age, education, and work experience, who is limited to only medium exertion.  The ALJ described this individual as able to lift up to thirty pounds occasionally; lift and carry up to twenty pounds frequently; pull and push frequently; climb ramps or stairs occasionally; occasionally stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds.  This individual would also be unable to operate any moving machinery, including driving a motor vehicle.  The VE testified that such an individual could not perform any of plaintiff's past positions of employment, except for the sales job at Sears and the position of safety director.  (Tr. 57-66.)

The ALJ then asked the VE to assume a hypothetical individual limited to work within the "light exertional category;" unable to climb ramps, stairs, ladders, ropes or scaffolds; and only occasionally able to push, pull, stoop, kneel, crouch, or crawl.  The VE testified that these limitations would eliminate everything except for the sales job at Sears.  The ALJ inquired about a further limitation of only "occasional rotation, flexion or extension of the neck."  The VE referred to the Dictionary of Occupational Titles ("DOT"), and responded that "there's really nothing in the DOT, and I can't really testify on my own outside of it that shows any limitation on that."  When the ALJ asked whether the limitation under this hypothetical would then be the same as for the second hypothetical, the VE responded in the affirmative.

The ALJ further inquired about an individual limited to working within the sedentary exertional category, requiring a sit/stand option every thirty minutes; and being unable to rotate, flex, or extend the neck at all.  The VE testified that such an individual could not perform any of plaintiff's previous jobs, nor any job in the local or national economy.  (Tr. 65-69.)

## III.   Discussion

### A.    The ALJ's Disability Determination

On February 10, 2010, the ALJ issued a written decision that concluded that plaintiff was not disabled under the Social Security Act.  (Tr. 11-23.)  In making this determination, the ALJ was required to complete the five-step sequential test provided in the Social Security regulations. See 20 C.F.R. § 404.1520(a)-(f); Page v. Astrue, 484 F.3d 1040, 1042 (8th Cir. 2007).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (cited case omitted); see also 20 C.F.R. § 404.1520(a)-(f).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined not disabled."  Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (cited case omitted).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work."  Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (cited case omitted).  If the claimant meets this burden, then the burden of proof shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform

a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. Id. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations.'" Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)). The ALJ has the duty to investigate the facts and develop a full record and arguments both in support of and against granting disability benefits. See Sims v. Apfel, 530 U.S. 103, 111 (2000).

At Step One, the ALJ found that plaintiff met the insured status requirement of the Act and had not engaged in substantial gainful activity since his alleged onset date, March 10, 2008. (Tr. 16.)

At Step Two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease and degenerative joint disease. At Step Three, the AlJ found that plaintiff's impairments do not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-17.)

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to perform light work except: climbing ropes, ladders or scaffolds; climbing ramps or stairs; stooping; kneeling; crouching; crawling; more than occasional rotating, flexing or extending of the neck; working with or around moving or hazardous machinery; and working at unprotected heights. Based on this RFC, at Step Four the ALJ found that plaintiff could perform his past relevant work as a sales associate and safety director. Thus, the ALJ found that plaintiff was not disabled within the meaning of the Act. (Tr. 17-20.)

B.      The Appeals Council

On March 25, 2011, the Appeals Council declined to review the ALJ's decision.  The

Council found the new evidence submitted from Dr. Krishnan and Dr. London to be inconsistent

with the earlier medical evidence.  The Council noted, however, that the ALJ's decision contained

two typographical errors pertaining to the RFC, and stated that the RFC should be amended to be

consistent with the ALJ's hypothetical question, to read that  plaintiff "can perform light work,

except no climbing ropes, ladders, scaffolds, ramps or stairs; and no more than occasional stooping,

kneeling, crouching, or crawling."  (Tr. 1-4.) (emphasis in original)

C.      Plaintiff's Arguments

Plaintiff argues that (1) the ALJ's finding at Step Four is not supported by the vocational

evidence; (2) the ALJ failed to evaluate and assign weight to the opinions of Dr. Coulis and Dr.

Berkin; (3) the ALJ failed to include the functional effects of plaintiff's gout in his RFC finding; (4)

the ALJ failed to evaluate the effect of plaintiff's obesity on the RFC; and (5) the ALJ's RFC finding

is not supported by substantial evidence.

1.      VE Testimony

Plaintiff argues that the ALJ's finding at Step Four is not supported by the vocational

evidence.

*(a)      Support for Sales Clerk Finding*

Plaintiff argues that the ALJ erred in failing to resolve all conflicts between the DOT and the

VE's testimony regarding the requirements for the sales clerk job.

At Step Four, the ALJ may elicit testimony from a VE to evaluate the claimant's capacity

to perform his past relevant work.  20 C.F.R. § 404.1560(b)(2).  When there is a conflict between

the VE testimony and the DOT, the ALJ is required to obtain an explanation for any such conflict. Renfrow v. Astrue, 496 F.3d 918, 920-21 (8th Cir. 2007).  However, if no conflict exists between the VE's testimony and the DOT, the ALJ's failure to inquire about a possible conflict is not reversible error.  Id. at 921.

In this case, the VE testified that the hypothetical limitations of "light exertion" would eliminate everything except for the sales job at Sears.  When the ALJ inquired about a further limitation of only "occasional rotation, flexion or extension of the neck," the VE referred to DOT, and responded that "there's really nothing in the DOT, and I can't really testify on my own outside of it that shows any limitation on that."  (Tr. 68.)  The ALJ then inquired, "[s]o then it would still remain the same as hypothetical number two?"  The VE responded in the affirmative, indicating that this person could perform the sales associate job.  (Tr. 68.)  There is no conflict here between the VE's testimony and the DOT, because the DOT is silent on the neck limitations for the job.  See Zblewski v. Astrue, 302 F. App'x 488, 494 (7th Cir. 2008) (holding that where the DOT is silent as to a limitation, the VE's testimony does not conflict with the DOT).  The ALJ's ruling that plaintiff could perform the sales associate position is substantially supported by the vocational evidence.

### (b)       Support for Safety Director Finding

Plaintiff argues that the ALJ's finding, that he retains the RFC to perform the work of safety director, is not supported by substantial evidence.  At Step Four, the ALJ is free to accept or disregard the VE's opinion "so long as the ALJ explains why the VE's opinion is treated the way the ALJ treats it."  Banks v. Massanari, 258 F.3d 820, 828 (8th Cir.  2001).

Here, when the ALJ posed a hypothetical to the VE with regard to a "light exertional" RFC, the VE testified that the only past relevant work that such an individual could perform would be the

sales position.  (Tr. 66.)  The ALJ adopted this same "light exertional RFC" for the plaintiff, but stated that plaintiff was capable of performing his past relevant work as a "safety director."  (Tr. 17, 20.)  Contrary to this finding, the position of safety director is precluded by plaintiff's RFC according to the VE's testimony.  Substantial evidence does not support the ALJ's finding that plaintiff could perform work as a "safety director."  Defendant concedes that the VE's testimony does not support the conclusion that plaintiff could work as a safety director.  (Doc. 17 at 12 n.1.)

Although this is not necessarily reversible error, see Hepp v. Astrue, 511 F.3d 798, 806, because the Court is remanding this action on a separate ground, on remand the ALJ shall correct this deficiency in the opinion.

2.    Opinions of Dr. Coulis and Dr. Berkin

Plaintiff also argues that the ALJ erred in evaluating the opinions of Dr. Coulis and Dr. Berkin.

(a)    Dr. Coulis

The ALJ must consider the findings of non-examining state agency physicians, and must evaluate factors relevant to weighing the physician's opinions.  20 C.F.R. § 404.1527(e). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State... physician."  Id. at (e)(2)(ii).

Dr. Coulis assessed plaintiff's RFC on November 21, 2008.  Dr. Coulis diagnosed degenerative disc disease, gout of the left toe, and possible peroneal tendinitis in the left foot.  Dr. Coulis opined that plaintiff was capable of performing medium work, meaning that he could lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and was unrestricted in pushing

or pulling.  Dr. Coulis opined that the severity of the plaintiff's pain was unsupported by concrete medical evidence and that there was no evidence that plaintiff's gouty toe was "impairing."  (Tr. 258-63.)

The ALJ must consider the opinions of non-examining state agency physicians.  In the case of a non-examining state agency medical consultant, like Dr. Coulis, the ALJ "may not ignore these opinions and <u>must</u> explain the weight given to these opinions in their decisions."  SSR 96-6p (emphasis added).  Here, as plaintiff correctly points out, the ALJ's decision does not discuss Dr. Coulis's findings or his opinions.  The decision does not summarize Dr. Coulis's medical evaluation or mention any information from Dr. Coulis's notes.  The ALJ's decision is entirely silent as to Dr. Coulis.

The ALJ determined that plaintiff has the residual functional capacity to perform light work. Pursuant to SSR 83-10, light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday.  <u>See</u> 20 C.F.R. § 404.1567(b), SSR 83-10.  The only medical evidence of record at the time of the hearing that addressed plaintiff's ability to stand and walk during an eight-hour workday is in Dr. Coulis's findings.  Although the ALJ adopted a less restrictive RFC finding than Dr. Coulis, the ALJ's finding of plaintiff's ability to stand and walk in an eight-hour workday is supported only by the opinion of Dr. Coulis.  The ALJ did not, however, examine or discuss these findings or explain the weight given to the opinion as required.  <u>See</u> <u>Willcockson v. Astrue</u>, 540 F.3d 878, 880 (8th Cir. 2008) (finding ALJ erred by implicitly relying on RFC assessment of nonexamining state medical consultant without explaining the weight given to the opinion).

The ALJ's decision does not discuss the opinions of the state agency medical consultant Dr. Coulis regarding the nature and severity of plaintiff's impairments. Nor does the decision discuss the weight given to Dr. Coulis's opinions. This is contrary to the requirements of 20 CFR § 404.1527 and SSR 96-6p. The ALJ seemed to implicitly rely on these opinions, however, as he adopted Dr. Coulis's finding that plaintiff could only stand or walk six hours of an eight-hour workday. The Court concludes that it must remand this matter to the Commissioner because it cannot determine from the written decision whether the ALJ properly reviewed the evidence. By addressing Dr. Coulis's opinions and explaining the weight given to Dr. Coulis's assessment, the ALJ will be complying with the regulations and assisting the Court in its review of the decision.

(b)   Dr. Berkin

Plaintiff argues that the ALJ erred in failing to evaluate Dr. Berkin's opinion using the factors of 20 C.F.R. § 404.1527(c)(1)-(6), including the supportability or consistency of Dr. Berkin's opinion.

Dr. Berkin evaluated plaintiff in September of 2009 after an examination in late August of that year. In his evaluation, Dr. Berkin opined that plaintiff suffered forty percent total body disability. Although Dr. Berkin recommended that plaintiff stay as active as possible, he also suggested that plaintiff should take frequent breaks when exerting himself. (Tr. 312-22.)

When the ALJ does not afford a medical opinion controlling weight, the ALJ is obligated to apply the factors of 20 C.F.R. § 404.1527(c) and give good reason for the determination of weight given to the opinion.[23] If the medical opinions in the record are consistent with each other, the ALJ

_____

[23]Factors include: the examining relationship, the treatment relationship (including length, frequency, nature and extent of treatment), the supportability of the opinion through laboratory findings and medical signs, the consistency of the opinion, the specialization of the physician, and other relevant factors that come

(continued...)

does not need to identify the weight given to each factor.  Hepp v. Astrue, 511 F.3d 798, 806-07 (8th Cir. 2008).

The ALJ summarized Dr. Berkin's findings in his medical evaluation without stating the weight of these findings.  (Tr. 19.)  The ALJ used Dr. Berkin's recommendation that plaintiff be as active as possible to support his holding that plaintiff suffers from troublesome but not significantly limiting impairments. (Tr. 19.) Dr. Berkin's opinion appears to be consistent with the other medical opinions on record, so the ALJ was not required to explain the weight assigned to the opinion. Substantial evidence supports the ALJ's evaluation of Dr. Berkin's opinion.

### 3.    Gout Condition

Plaintiff argues that the ALJ failed to include the effects of plaintiff's gout in the RFC determination.

The record shows that the ALJ adequately evaluated plaintiff's gout condition.  The ALJ referred to plaintiff's testimony regarding his gout, noting that plaintiff had gout attacks about twice a month which primarily affected his right foot and great toe, and that medication took a few days to resolve the problem. (Tr. 18.) In addition, the ALJ referred to Dr. Helfrey's mention of plaintiff's history of gout.  (Id.)  The ALJ also determined that plaintiff's statements about the intensity, persistence, and limiting effects of his conditions were not credible.  (Tr. 19.)  The ALJ clearly evaluated the plaintiff's gout in his RFC, stating that he found that plaintiff's ailments "appear troublesome but do not preclude employment." (Tr. 20.)

### 4.    Obesity Condition

---

²³(...continued)
to the ALJ's attention.  20 C.F.R. § 404.1527(c)(1)-(6).

Plaintiff argues that ALJ erred in failing to evaluate the effects of obesity on plaintiff's RFC.

Obesity is a "nonexertional impairment which might significantly restrict a claimant's ability to perform the full range of sedentary work." Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997). When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider to what extent the nonexertional impairments further diminish the claimant's work capacity. Id. at 908.

In this case, the ALJ did not specifically discuss plaintiff's obesity in his decision. However, plaintiff failed to allege any restrictions resulting from his obesity either in his initial disability application or during the ALJ hearing. (Tr. 32-70, 154.) See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (holding that the plaintiff's claim of limitations based on obesity is waived when the claimant fails to allege any limitation in function because of obesity in either his disability application or during the ALJ hearing). In addition, although Dr. Stachecki noted plaintiff's obesity, he did not note any restrictions resulting from it. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (holding that the ALJ need not consider the claimant's obesity in the RFC determination where treating physicians noted the claimant's obesity but did not find it caused any work-related limitations). Several of plaintiff's evaluating physicians noted his weight, but none of them suggested any specific limitations resulting from his obesity. Because neither plaintiff's medical records nor his testimony indicated any limitations resulting from his obesity, the ALJ's failure to discuss any possible obesity-related limitations for the RFC determination was not an error. McNamara v. Astrue, 590 F.3d 607, 612 (8th Cir. 2010).

5.    Evidence for RFC Finding

Plaintiff argues that new medical evidence submitted to the Appeals Council from Dr. Krishnan and Dr. London further undermines the ALJ's RFC determination.[24]   The Appeals Council must consider any new, material evidence that relates to the period on or before the date of the ALJ's decision.   20 C.F.R. § 404.970(b).     Where the Appeals Council declines to review, the court evaluates whether the record as a whole, including any evidence submitted directly to the Appeals Council, supports the ALJ's determination.   See Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).

The ALJ determined, with the later clarification of the Appeals Council, that plaintiff retained the RFC to perform light work with the exceptions of no climbing; no more than occasional stooping; kneeling; crouching; crawling; no more than occasional rotating, flexing or extending of the neck; no working with or around moving or hazardous machinery; and no working at unprotected heights.  (Tr. 17.)

Although Dr. London's opinion does differ from the ALJ's RFC finding, the Appeals Council suggested that this opinion is inconsistent with Dr. Berkin's earlier opinion and also comes five months after the date of the ALJ hearing.   Even if Dr. London's opinion was submitted as evidence in time for the ALJ hearing, the ALJ has the right to reject the conclusions of any medical expert if they are inconsistent with the record as a whole.   See Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (ALJ can reject the conclusions of any medical expert that are inconsistent with the record as a whole).   In addition, Dr. London's opinions may also deserve less weight because

---

[24]Plaintiff also argues that the ALJ's RFC finding is not supported by substantial evidence. Because this case is being remanded with directions to the ALJ to consider and evaluate the opinions of Dr. Coulis, the Court will not address whether the ALJ's RFC finding, which does consider and evaluate Dr. Coulis's opinion, is supported by substantial evidence.

much of the supporting information reflects plaintiff's subjective complaints.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 709 (8th Cir. 2007).  Dr. London's report states that "based on [his] evaluation and review of records," plaintiff's limitations have existed since 2006.  Dr. London did not, however, review any of plaintiff's medical information prior to the examination on June 29, 2010.  If Dr. London reviewed no prior medical records, the only basis for his opinion that plaintiff's onset of limitations began in 2006 is plaintiff's oral history and subjective complaints.

Dr. Krishnan's opinion does not add additional medical evidence to the record, he restates prior findings regarding the plaintiff's pain and states his opinion that plaintiff is unable to pursue employment.  Dr. Krishnan's evaluation also came four months after the ALJ's hearing, and there is no indication from the record that the evaluation relates to the period on or before the date of the ALJ's decision.  (Tr. 335-36.)

IV.    <u>Conclusion</u>

The Court concludes this matter should be remanded to the Commissioner for further proceedings in accordance with this Memorandum and Order.  On remand, the ALJ shall fully and fairly develop the record and explicitly consider and evaluate the findings and opinions of the state agency medical consultant, Dr. Despine Coulis.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying Claimant's applications for Disability Insurance Benefits under Title II of the Social Security Act is **REVERSED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order pursuant to sentence four of § 405(g).

An appropriate judgment will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this   24th   day of September, 2012.